UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNITRA DOUGLAS,

               Plaintiff,                        Case No. 2:24-cv-11999

v.                                      Hon. Brandy R. McMillion
                                      United States District Judge

EW HOME CARE CORP., d/b/a
BRIGHTSTAR CARE OF BIRMINGHAM,
ROCHESTER, TROY & ROYAL OAK,
a Michigan corporation,

               Defendant.

_____ /

**OPINION AND ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT (ECF NO. 17)**

Plaintiff, Kennitra Douglas ("Plaintiff" or "Douglas") brought this race discrimination and retaliation action against Defendant, EW Home Care Corp. d/b/a Brightstar Care of Birmingham, Rochester, Troy & Royal Oak ("Brightstar" and "the Company"). *See generally* ECF No. 1. According to Plaintiff, Brightstar violated 42 U.S.C. § 1981 ("Section 1981") and the Elliott-Larsen Civil Rights Act, MCL 37.2101, *et seq*. ("ELCRA") when it racially discriminated and retaliated against her by terminating her employment. *Id.* Defendant disagrees and moves for dismissal on summary judgment. *See* ECF No. 17. The Motion has been adequately briefed,

1

and the Court finds oral argument unnecessary so it will rule based on the record before it without need for a hearing.  *See* ECF Nos. 17, 22, 23; E.D. Mich. L.R. 7.1(f)(2).  For the reasons stated herein, the Motion for Summary Judgment (ECF No. 17) is **GRANTED**.

## I.

"Brightstar is a medical services provider that offers in-home care, skilled nursing, and medical staffing for hospitals, nursing homes, schools, and other places where healthcare staff is needed."  ECF No. 17, PageID.84.[1]  Plaintiff, an African-American caregiver, began working for the Company in late 2022.  *Id.* at PageID.85.  Plaintiff's placement was at the Blossom Facility ("Blossom")—an independent entity with its own staff that is owned by Blossom Entity.  *Id.*  However, Brightstar has a permanent office at Blossom, where it also provides resident care.  *Id.*

Around mid-2023, Brightstar created a trial-based Lead Caregiver position and temporarily offered it to Plaintiff and Lorena Robinson ("Robinson"), a Caucasian caregiver at the Company.  *Id.* at PageID.86.  After observing both

---

[1] The Court notes Defendant's position that Plaintiff's "Statement of Facts" does not align with the Court's practice guidelines.  ECF No. 23, PageID.284.  The Court agrees and directs Plaintiff and her counsel to the Court's publicly-available practice guides.  *See* Judge Brandy R. McMillion Practice Guidelines: Motion Practice, Summary Judgment Motions (stating, in part, "The party opposing the motion must respond to each numbered paragraph and has the option to include additional numbered paragraphs containing separate, short and concise statements of additional material facts, if necessary to demonstrate there exists a genuine issue to be tried.  Each numbered paragraph in the moving party's motion will be deemed admitted unless specifically controverted by a corresponding numbered paragraph in the statement of the opposing party.").  In the interest of resolving cases on their merits, the Court will proceed.

employees during the trial period, the Company decided to retain Plaintiff for the Lead Caregiver position and reassign Robinson to her original Caregiver role. *Id.* Both Brightstar and Douglas considered the role a promotion that came with additional and supervisory responsibilities. *Id.* For example, "Plaintiff continued to be responsible for providing care to residents, and she took on additional responsibilities, such as serving as an oncall employee and assisting with creating work schedules." *Id.* In this role, Plaintiff oversaw other Caregivers during their shift at Blossom. *Id.* Plaintiff reported to Brightstar's Director of Nursing, Vera Bodnaruk ("Bodnaruk" or "the DON"), *id.* at PageID.87, and indirectly, she reported to Edwin Wudyka ("Wudyka")—the owner of Brightstar, and Marcy Lovelace—the Human Resources Director ("HR Director"), *id.* According to Plaintiff, however, she and Bodnaruk shared many similar expectations. ECF No. 22, PageID.261.

The Company was not pleased with Douglas's performance as Lead Caregiver. *Id.* at PageID.87. For example, Plaintiff has inconsistent attendance, she rudely spoke to the staff, and often gave her friends easier assignments while failing to assist and guide others as the Company expected of her in the role. *Id.* at PageID.87. To help with resolving Plaintiff's performance, and specifically, her attendance, the Company accommodated her by altering her start time. *Id.* at PageID.88. Although Plaintiff concedes to the attendance issues, she maintains the

3

HR Director never spoke with her about any poor work performance.  ECF No. 22, PageID.261.

To be expected in her new role, caregiving staff reported issues to Douglas. ECF No. 17, PageID.88.  A common report she received pertained to Robinson's lack of efficiency in the job.  *Id.*  Brightstar contends none of the complaints were ever about race.  *Id.*  Douglas asserts otherwise, alleging Robinson engaged in "racist behaviors toward other staff[.]"  ECF No. 22, PageID.261.  Given the efficiency concerns, nonetheless, Brightstar reassigned Robinson to work one-on-one with clients with whom she had already built rapport.  ECF No. 17, PageID.88.

In June 2024, Blossom Entity informed Brightstar about a posted Tiktok video which included an elderly resident.  ECF No. 17, PageID.88-89.  Brightstar obtained the video and saw it depicted "a Brightstar Caregiver standing behind the elderly resident with her hands on his shoulders or head[… and w]hile music played, the Caregiver shook the man's head back and forth."  *Id* at PageID.89.  The HR Director determined that the video was a potential violation of the Company's policies and a HIPAA violation.  *Id.*  Blossom Entity directed Brightstar to remove the following individuals from the Blossom Facility: Paradise Jamison ("Jamison"), Tamara Thornton ("Thornton"), and Kennitra Douglas (Plaintiff).  *Id.*  Given this, the HR Director met with the three employees and concluded that Jamison appeared in the video, Thornton recorded the video, and Plaintiff had knowledge of the video but

failed to report it to the Company.[2]  *Id.* at PageID.89.  Although Plaintiff admits Defendant cited her supervisory role as the basis for her termination, she disputes it as the true reason.  ECF No. 22, PageID.263.  She alleges that instead, Defendant racially discriminated against her by terminating her employment because she was present at the facility when the Tiktok was recorded and because of her supervisory position, while failing to treat the DON similarly, despite allegations that the DON was also present in the building and likewise held a supervisory role.  *Id.*

In connection with her claims of discrimination and retaliation, on August 1, 2024, Douglas filed a Complaint to initiate this action.  *See generally* ECF No. 1.  On September 25, 2025, Defendant now moves for Summary Judgment on all claims.  *See generally* ECF No. 17.

## II.

If "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" summary judgment is proper.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  In turn, a nonmoving party must present "significant probative evidence" to show that there is "more than some metaphysical doubt as to the material facts necessitating a trial[.]"  *Green Genie, Inc. v. City of Detroit, Mich.*, 63 F.4th 521, 526 (6th Cir.

---

[2] According to Defendant, "Plaintiff was discharged because Brightstar determined that she was a Lead Caregiver who had knowledge of the video and that residents at the Blossom Facility were being recorded in violation of policy, but she did not report those violations or take any other steps to stop them from occurring."  *Id.* at PageID.89.

5

2023).  The "facts must be viewed in the light most favorable to the nonmoving party *only if* there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The non-moving party may not rely on his pleadings alone but instead must demonstrate the existence of a genuine issue for trial by pointing to 'specific facts' that create such an issue."  *Hamilton v. Myers*, 281 F.3d 520, 525 (6th Cir. 2002) (citation omitted).  "A mere scintilla of evidence" is insufficient to forestall summary judgment."  *Babcock & Wilcox Co. v. Cormetech, Inc.*, 848 F.3d 754, 758 (6th Cir. 2017).  A genuine issue of material fact that can withstand a motion for summary judgment is not created if plaintiff provides conclusory assertions, supported only by his own opinions.  *Arendale v. City of Memphis*, 519 F.3d 587, 608 (6th Cir. 2008); *see also Johari v. Big Easy Rest., Inc.*, 78 F. App'x 546, 548 (6th Cir. 2003).

### III.

### A. DISMISSAL OF RETALIATION CLAIM

Plaintiff withdraws both her retaliation claims—under Section 1981 and the ELCRA.  ECF No. 22, PageID.279-280.  So they are hereby dismissed.

**B. RACE DISCRIMINATION CLAIMS**

Under both Section 1981 and the ELCRA, employers are prohibited from discriminating or discharging an employee on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 1981; Mich. Comp. Laws § 37.2202(1)(a). Douglas alleges that Defendant violated both laws by treating her differently based on race and "engaging in unfair and discriminatory treatment against its non-White employees, including Plaintiff, and treat[ing] White employees better." ECF No. 22, PageID.264. *See also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (noting that the Sixth Circuit reviews alleged race discrimination claims brought under § 1981 and the ELCRA under the same standard as those brought under Title VII). Defendant contests Douglas's allegations and requests that the Court dismiss the claims because none of the evidence in the record creates any triable questions of fact for a jury. *See generally* ECF No. 17. Defendant's argument boil down to (1) Plaintiff's § 1981 claim fails because she cannot prove any intent to discriminate against her, and (2) the ELCRA claim similarly fails because Plaintiff cannot identify a non-Black, similarly situated employee who Defendant treated more favorably than her. ECF No. 17, PageID.92-93, 97 (citing *Burton v. Plastics Research Corp.*, 134 F.Supp.2d 881, 886 (E.D. Mich. March 30, 2001) and *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012)).

As Brightstar correctly notes, Plaintiff must first establish that "(1) she is a member of a racial minority, (2) Brightstar intended to discriminate based on race, and (3) the discrimination concerned one or more of the activities enumerated in Section 1981." ECF No. 17, PageID.92 (citing *Burton v. Plastics Research Corp.*, 134 F.Supp.2d 881, 886 (E.D. Mich. March 30, 2001); *see also Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006) (reciting the same elements). And where carrying this burden is concerned, Defendant maintains that Plaintiff cannot prove the second element—Brightstar's alleged intent to discriminate against her because of her race. ECF No. 17, PageID.92-93. To successfully overcome Defendant's argument, Plaintiff may prove intent to discriminate through either direct or circumstantial evidence. *See Amini*, 440 F.3d at 358 ("When a claimant seeks to prove intentional discrimination inferentially in a section 1981 case, federal courts follow the burden-shifting framework that the Supreme Court has prescribed for analogous civil rights cases described in *McDonnell Douglas v. Green* […]").[3] Since Plaintiff's opposition brief advances both theories in the alternative, the Court will address each separately. *See* ECF No. 22, PageID.268-279.

---

[3] Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions" and it "does not require the fact finder to draw any inferences to reach that conclusion. *Amini*, 440 F.3d at 359 (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir.2005)). Importantly, "[e]vidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed." *Amini*, 440 F.3d at 359.

### 1. *Direct Evidence*

Douglas insists there is direct evidence of Brightstar's racial discrimination against her because she "and others complained about a Caucasian co-worker. The owner's testimony vouched for the co-worker by him saying she wasn't racist, and then doing nothing to remedy the problem." ECF No. 22, PageID.269. She continues, "the owner testified that he believed the Caucasian DON when she said she hadn't been drinking yet refused to believe Plaintiff that she hadn't taken part in the video. That is direct evidence from the lips of the owner that he views his White employees in a better light than his Black employees." *Id.* However, the Court finds it difficult to reconcile Plaintiff's purported "direct evidence" with the applicable standard.

"Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543–44 (6th Cir. 2008). In *Christopher v. Stouder Mem'l Hosp.*, the Sixth Circuit held that there was sufficient direct evidence where "[Defendant] raised its prior qualification standards and denied [Plaintiff] limited privileges in retaliation for her prior sex discrimination suit." 936 F.2d 870, 879 (6th Cir. 1991). Meanwhile, here, Plaintiff's reading of the factual record misconstrues the evidence. She maintains that "the owner testified that he believed the Caucasian DON when she said she hadn't been drinking yet

9

refused to believe Plaintiff that she hadn't taken part in the video[,]" which is "direct evidence from the lips of the owner that he views his White employees in a better light than his Black employees."  ECF No. 22, PageID.269.  Her reading is conveniently overbroad.  For example, Plaintiff's counsel asked Wudyka about the alleged drinking incident at issue, and the following exchange ensued.

> *Plaintiff's Counsel*: Are you aware of any instance where Kennitra Douglas complained that Vera Bodnaruk was either drinking on the job or came to work under the influence?
>
> *Deponent (Wudyka)*: It was brought to my attention that Kennitra had concern that Vera had. I questioned Vera, and she said emphatically that was not the situation. And I had said, "Did you have a drink during lunch?" "No." "Were you at a social function?" "No." "Did you come in hung over?" "Nope." So there was no reasoning for me to question her outside of that because it's a he-said, she-said situation. It wasn't Vera was slurring her words. Nobody collaborated with Kennitra. No one else brought it to my attention, none of the supervisors from Blossom. So it was purely a he-said, she-said. I did address it with her.
>
> *Plaintiff's Counsel*: Was it only the one time that you are aware of?
>
> *Deponent (Wudyka)*: It was only the one time.

ECF No. 17-2, PageID.117.  Additionally, during Plaintiff's own deposition, she was asked "how [she…] became aware of" Bodnaruk's drinking at work?"  She provided the following response.

> *Plaintiff*: So inside of the facility there is a bar for the residents. She was at the bar and had several drinks at the bar. Sometimes she would come to work after she went to like out to lunch or something she would come back smelling like liquor. There's numerous times I knew that she had been under the influence. One day she called me from home, and she had just got done drinking a bottle of wine and came up to work. I know that because we had

10

this conversation about her, you know, drinking and management was very aware of it.

ECF No. 17-4, PageID.171. For starters, the record does not compel the straightforward conclusion Plaintiff hopes for. Second, and more importantly, even if the Court credited Douglas's account of the DON's alleged drinking incident as true, it does not constitute direct evidence. In fact, Plaintiff's representations necessarily require an inference of discrimination: because Bodnaruk is white, Wudyka took her word as true, whereas she did not afford Plaintiff, a Black employee, the same credibility. Even charitably construed, these allegations fall within a circumstantial evidence theory, not direct evidence. This is so because they do not reasonably suggest that race discrimination was "at least a motivating factor" in Plaintiff's termination. *Amini*, 440 F.3d at 359 (cleaned up). Therefore, none of Douglas's offered evidence constitutes direct evidence of discrimination, so her claim cannot survive on such a theory.

### 2. *Circumstantial Evidence*

Plaintiff's attempt to carry her burden under a circumstantial-evidence theory also comes up short. To do so, she must demonstrate (i) that she is a member of a protected class; (ii) that she suffered an adverse employment action; (iii) that she was qualified for the position; and (iv) that a similarly-situated employee outside the protected class or classes was treated more favorably than her. *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 365 (6th Cir. 2010). Defendant challenges the

11

final element, arguing that Plaintiff has not—and cannot—show that Defendant treated a similarly situated, unprotected individual more favorably than Plaintiff. ECF No. 17, PageID.97.

Plaintiff responds that Defendant's contention is a "red herring" because "the evidence suggests everybody in the building had to be fired, but a White Director of Nursing who was in the building wasn't fired[,]" and "other evidence of disparate race based treatment of employees is provided sufficient to support Plaintiff's case." ECF No. 22, PageID.266. In doing so, Douglas appears to confuse the fact that her prima facie case "is not meant to be an onerous burden" with the notion that she may minimally satisfy the required elements—if at all. *Id.* (citing *DeBoer v Musashi Auto Parts, Inc*, 124 Fed. Appx 387, 390 (6th Cir 2005)). But the case law provides no support for that view. Indeed, in the very authority Plaintiff herself cites to, the Sixth Circuit relied on substantively more evidence than plaintiff presents here.[4] Despite her efforts to diminish the comparator analysis, her race discrimination claims cannot survive without it under a circumstantial evidence theory. Accordingly, Douglas must show there is a genuine dispute of material fact as to whether a similarly-situated, unprotected individual was treated better than her.

---

[4] *See DeBoer*, 124 Fed. Appx at 391 (holding that plaintiff established a prima face case of discrimination under ELCRA based on the evidence she put forward. For example, "She was pregnant, qualified for her position, and she suffered an adverse employment action. The timing of her demotion, following closely after her announcement of her pregnancy, sufficiently constitutes a circumstance giving rise to an inference of unlawful discrimination. A prima face case of discrimination under ELCRA has been established.")

"[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992). Plaintiff submits that she and Bodnaruk—a director of nursing at the Company—were essentially similarly-situated because they "shared many of the same duties and responsibilities[.]" ECF No. 22, PageID.261. This is not enough. Plaintiff fails, for instance, to allege that she and Bodnaruk were subject to the same standards at work. In fact, Wudyka's testimony appears to suggest they were not.

> *Plaintiff's Counsel*: [W]ere you able to independently verify where [Bodnaruk] was that day [that the Tiktok video was recorded]?
>
> *Deponent (Wudyka)*: The day the video was taken, probably not.· I mean […] if I had to, I probably could go back, if we had a date and time of the video, and I could see if she was on an infusion or check on one of the **hundred tasks** she was to do. **Her job wasn't to sit in that building. That wasn't her job**.

ECF No. 17-2, PageID.120 (emphasis added). But even if the Court rendered Douglas and Bodnaruk sufficiently similarly situated employees, the extent to which Plaintiff alleges Bodnaruk was treated more favorably than her is that "Defendant told Plaintiff every one of Defendant's employees who were in the building [during the Tiktok incident] had to be terminated[.]" ECF No. 22, PageID.263. So, Plaintiff maintains, "[i]f everybody in the building had to be fired, or if supervisors had to be

13

fired, the Caucasian DON should have been fired, but wasn't[.]" As a preliminary matter, Plaintiff appears to concede that there is no confirmation about whether Bodnaruk was actually in the building.

> *Plaintiff's counsel*: But you didn't do that; right? You didn't dig that deep or confirm that deep where she was that day; right?
>
> *Deponent (Wudyka)*: I believe at the time we knew she was not in the building.
>
> *Plaintiff's counsel*: Because she told you?
>
> *Deponent (Wudyka)*: She told us and other people told us.
>
> *Plaintiff's counsel*: Who else told you?
>
> *Deponent (Wudyka)*: I believe the three girls had said she wasn't there.
>
> *Plaintiff's counsel*: Okay. If my client is alleging that Vera was in the building, it couldn't have been my client who told you; right?
>
> *Deponent (Wudyka)*: Or your client is not telling the truth.
>
> *Plaintiff's counsel*: Okay. Or Vera is not telling the truth; right?
>
> *Deponent (Wudyka)*: Or Vera is not telling the truth.
>
> *Plaintiff's counsel*: We don't have any confirmation, is all I'm saying. Right?
>
> *Deponent (Wudyka)*: Correct, we do not.
>
> *Plaintiff's counsel*: Had Vera been in the building when the video was taken, and the management of the facility demanded the removal, would she have been fired?
>
> *Deponent (Wudyka)*: Yes.

ECF No. 17-2, PageID.120.  Given this, a reasonable jury could not find that Bodnaruk was treated more favorably than Douglas at all, never mind on the basis of race.  This is even more so when considering Defendant's assertions that Blossom

explicitly requested Douglas be terminated, along with the two other caregivers who were involved in creating the Tiktok video—Jamison and Thornton.  ECF No. 17, PageID.89.  At most, Plaintiff only generally acknowledges Blossom's request.  *See* ECF No. 22, PageID.273-274.  And that request – from an independent entity – did not include the DON.   Therefore, measured against the applicable standard, Douglas's showing of favorable treatment is legally deficient.[5]

For these reasons, Plaintiff's race discrimination claims under Section 1981 and the ELCRA are dismissed, as is the Complaint in its entirety.

**IV.**

Defendant's Motion for Summary Judgment (ECF No. 17) is therefore **GRANTED**, and Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

*This is a final order that closes the case.*

Dated: May 26, 2026                          /s/ Brandy R. McMillion
     Detroit, Michigan                        Hon. Brandy R. McMillion
                                        United States District Judge

---

[5] Similarly, the Court finds that Douglas's account of the DON's alleged drinking incident is legally insufficient to show favorable treatment, as these two incidents (drinking on the job and failing to report policy violations) would not qualify as "engag[ing] in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell*, 964 F.2d 577.